UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| LUKE YEAGER, | ) | NO.  CV-12-0360-LRS |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING DEFENDANT** |
| | ) | **KAISER'S MOTION FOR SUMMARY** |
| -vs- | ) | **JUDGMENT** |
| | ) | |
| KAISER ALUMINUM WASHINGTON, LLC, | ) | |
| a Delaware limited liability | ) | |
| company; | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

   **BEFORE THE COURT** is Defendant Kaiser's Motion For Summary Judgment(ECF No.  14), filed on November 6, 2013.  A hearing was held March 6, 2014 in Yakima, Washington.  Lawrence Jay Kuznetz participated on behalf of the Plaintiff; William M. Symmes participated on behalf of Defendants.  At the close of the hearing, the Court took the matter under advisement.

   Defendant Kaiser Aluminum moves for an order dismissing the case based on lawful termination of Plaintiff (a unionized United Steel Worker) for failure to adhere to the Company's Sickness & Accident (S&A) policies and Absentee Policy.  Defendant argues Plaintiff Yeager failed to obtain the requisite certification to excuse his absence between February 5, 2009 and April 24, 2009.  Further, Defendant asserts,

ORDER - 1

Plaintiff was not terminated because of discrimination as he complains-but because he never provided Occupational Health Solutions, Inc. (OHS), Kaiser, or his Union with a medical certification to excuse this 11-week, unsubstantiated absence despite multiple requests and warnings from Kaiser, OHS, and the Union. As a result, Kaiser terminated Plaintiff on June 27, 2009 for his unexcused absence between February 5 - April 23, 2009.

While the parties assert different factual scenarios, the facts necessary for resolution of this case on summary judgment are not disputed and will only be abbreviated herein. Plaintiff Luke Yeager ("Plaintiff" or "Mr. Yeager") is a resident of Stevens County, Washington, and was a production employee of Kaiser from May 2007, until June 27, 2009. Defendant Kaiser owns and operates an aluminum fabrication plant[1] in Spokane County, Washington.

**A. Union Protocols**

All of the hourly production workers at the plant, including Plaintiff, are members of Local 338 of the United Steelworkers (the "Union").[2] Kaiser and the Union have entered into various labor agreements, which govern the terms and conditions of employment for the production workers at the Trentwood Works. The principal agreement between Kaiser Aluminum and the Union is called the Master Labor Agreement (a/k/a the collective bargaining agreement and hereinafter

---

[1]The plant is known as the "Trentwood Works" (hereinafter "Trentwood").

[2]The Union serves as the exclusive bargaining agent for these workers with respect to the terms and conditions of their employment with the Company.

ORDER - 2

referred to as "CBA"), which governs rates of pay, hours of work, and conditions of employment with respect to the hourly production workforce at the Trentwood Works.

Article 11 of the CBA prevents Kaiser from terminating any hourly production worker unless it has "proper cause" to do so.  If an hourly production worker or the Union believes that Kaiser has terminated an employee without "proper cause," then pursuant to Article 10 of the CBA, the employee or the Union may file a grievance challenging Kaiser's decision.  If a grievance is filed, the Union and the Company commence the multi-step grievance process required by Article 13 of the CBA in an effort to resolve their differences.  Pursuant to Article 13 of the CBA, in most cases, the terminated employee remains on the job until the grievance is finally resolved.

If the grievance process does not resolve the differences with respect to the termination of an employee, the CBA dictates the final step in the Grievance process. The question of whether Kaiser had "proper cause" to terminate an employee is submitted to an impartial arbitrator who is mutually selected by Kaiser and the Union.  At the arbitration hearing, Kaiser has the burden to persuade the arbitrator that it had proper cause to terminate the employee.  Under Article 10 of the CBA, the parties have agreed that the arbitrator's decision is final and binding on both the Company and the Union.

Pursuant to Article 11 of the CBA, Kaiser may exercise its Management Rights to promulgate various policies to govern the workforce at Trentwood.  One such policy is the Kaiser Aluminum - Trentwood Works Absentee Policy.

ORDER - 3

**B. Absentee Policy and S&A Benefits**

The Absentee Policy[3] is a "no-fault" policy based upon points.  In other words, barring a few exceptions, employees who are absent from work receive points against their attendance record. Depending upon the reason, the points against their record may range from 1-3.   An accumulation of 9 points in a 26-week period will result in discipline. The first time an employee receives 9 points in 26 weeks, he or she receives a written warning.  The second time an employee accumulates 9 points in a 26-week period, he or she receives a written warning and a 3 day suspension.   The third time it occurs, the employee receives a 5-day suspension pending discharge.

Certain absences are exempt from point accumulation.  Examples of absences which do not result in points or any adverse consequences are: (1) absences certified to be the result of an industrial injury or illness; (2) approved vacations; (3) official union business; (4) military service; (5) jury duty or bereavement leave; (6) authorized personal leave of absence under the CBA; (7) authorized educational leave of absence under the CBA; and (8) FMLA/disability leave explicitly certified as such by a health care provider.  But when an employee's absence is not for an exempt reason as set forth above, his or her absence results in the accumulation of 2 points for each day the employee is absent.  If an employee is absent for 2 or more days while the employee is under the care of a doctor, and the doctor certifies that the employee was too ill to report for work, the employee will receive only 2 points for the entire period of absence.  The Absentee Policy also

---

[3]ECF No. 16-2.

ORDER - 4

provides that "consecutive absences of one scheduled workweek without notification shall result in a voluntary separation from the payroll."

An employee will receive 3 points (as opposed to 2) if the employee fails to report off work pursuant to the Absentee Policy. Pursuant to the Absentee Policy and Section 10-02 of the Local Labor Agreement between Kaiser and the Union, a Union worker is required to contact the Guard Office at least one hour prior to the scheduled start of the shift. The Guard Office will then provide Human Resources a daily report of employees who have reported off from work. If an employee is absent or anticipates being absent for 3 or more days due to a reported illness or injury, Human Resources will work through Occupational Health Solutions ("OHS"), located in Spokane, to monitor the employee's absence.

Kaiser contracts with OHS as a third-party vendor to manage all of the occupational and non-occupational illnesses and injuries of the hourly workforce. In this role, OHS provides Nurse Case Managers ("NCM") to work as liaisons between the Union workers and Kaiser's Human Resources Department. Employees are informed about OHS, the NCMs, and their role during mandatory employee orientation just after being hired at Kaiser. Union employees are instructed on how to coordinate sick and injury leave with OHS.

As is relevant to this matter, the NCM may receive telephone calls from hourly production workers who have been injured or who are suffering from an illness that the employee believes precludes him/her from performing his/her job duties for more than 2 days. The NCM does not examine or diagnose the employee. The NCM makes a determination whether to excuse the hourly production worker from going to work based upon a

ORDER - 5

telephone conversation with the worker.  However in doing so, NCM gives the employee the benefit of the doubt and accepts what the employee is saying as true.  If the NCM determines that the employee should be off work for more than 3 days, the NCM conditionally places the hourly production worker on sick leave and notifies the Company's Human Resources Department that the employee has been placed on sick leave. The decision of the NCM merely initiates the sick leave process.

Of significance, the NCM does not tell the Company what condition the employee has that necessitates his or her absence from work.  Without an executed release from the employee, the Privacy Rule in the Health Insurance Portability and Accountability Act ("HIPAA") and Article 14 of the CBA prevent any discussion between the NCM and the Company in this regard.  After the employee is placed on sick leave, the NCM's role is to monitor the employee's progress.

In conjunction with the hourly production worker and his or her health care provider, the NCM receives the medical certification to initially authorize the leave, and upon the employee's recovery, to clear the employee back to work.  Because the NCM does not examine or diagnose an employee's medical condition, it is not the NCM's role to certify an employee's absence from work.  It is the NCM's job to receive and review the employee's medical certification obtained by the employee from the employee's health care provider on behalf of Human Resources.

Article 15 of the CBA provides certain Group Insurance benefits to Kaiser's Union workforce.  In accordance with this provision of the CBA, Kaiser provides the Union workforce Sickness and Accident Benefits ("S&A").  S&A benefits are cash benefits paid weekly to any Union worker

1  who is certified by a licensed physician as being unable to work due to

2  a medical condition.   Benefits are not payable for any period during

3  which the employee is not under the care of a licensed physician.

4  Trentwood's Human Resources Department sends a letter to an hourly

5  production worker who has been placed on sick leave, informing the

6  employee of his or her obligations to coordinate with a NCM to obtain the

7  requisite medical certification, verifying the absence is due to a

8  medical condition and that he or she is unable to work.   It is the

9  employee's responsibility under the CBA to obtain the requisite

10 certification and ensure it is forwarded to the Nurse Case Manager for

11 purposes of both the Absentee Policy and S&A eligibility.   ECF 17 at 3.

12     **D. Chronology of Relevant Events**

13     In **May of 2007,** Plaintiff began his employment at Kaiser.[4]   On **March**

14 **28, 2008,** Plaintiff accumulated 9 points in a 26-week period and received

15 a Written Warning pursuant to Kaiser's Absentee Policy.   Neither the

16 Union nor Mr. Yeager grieved this discipline.   On **May 2, 2008,** Plaintiff

17 accumulated an additional 9 points in a 26-week period and received a

18 Written Warning plus a 3 day suspension. Neither the Union nor Mr. Yeager

19 grieved this discipline.   On **October 21, 2008,** Plaintiff accumulated an

20 additional 9 points in a 26-week period and received a Written Warning

21 plus a 5 day Suspension Prior to Discharge.   On **January 6, 2009,** Mr. Gary

22 Newbill, the Chief Grievance Person for the Union, filed a Grievance

23 taking exception to Kaiser's anticipated termination of Plaintiff.

24 ///

25

26     [4]On October 9, 2006, Mr. Yeager was terminated for excessive
absenteeism from L. B. Foster Company (also known as CXT), a prior
employer.

ORDER - 7

On **February 3, 2009**, the Union and the Company held a Step 3 Meeting pursuant to the Grievance Process of the CBA.  The purpose of the Step 3 Meeting was to discuss the absenteeism of Plaintiff and his possible discharge.  As a result of this Step 3 Meeting, Kaiser agreed to mitigate Plaintiff's discipline and modify his attendance record to reflect the corrected points in accord with the agreement reached between Kaiser and the Union at the Step 3 Meeting.  Accordingly, Plaintiff was not discharged.

On the evening of **February 4, 2009** (one day after settling his grievance), Plaintiff called OHS from his foreman's office and told NCM Rise that he didn't think he should be at work.  Based solely upon what Plaintiff told NCM Rise, she placed him on sick leave on **February 5, 2009,** subject to Mr. Yeager's adherence to the Absentee Policy.  NCM Rise then notified the Human Resource Department that Mr. Yeager had been placed on sick leave.  Pursuant to established protocol, NCM Rise did not tell anyone employed by the Company why Mr. Yeager was being placed on sick leave.  Mr. Yeager was directed to stay in contact with the NCM while out on sick leave.  According to Defendant, between February 5, 2009 and April 1, 2009, the NCMs at OHS spoke with Mr. Yeager on only three occasions:  February 8, February 13, and February 19, 2009.

Despite well over a dozen phone connections with OHS shown in Plaintiff's phone records for the months of February, March, April, and May, he asserts he did not learn until April 24, 2009, that he was obligated to turn in a written health care provider's medical excuse for his absences during most of the prior three (3) months.  The record reflects that Mr. Yeager had been provisionally receiving S&A benefits

in the form of weekly cash payments since February 11, 2009.  As noted
below, they were discontinued by Kaiser in early April of that year.

On **April 3, 2009,** NCM Rise emailed Paul Stoyell-Mulholland (then the
Human Resources Manager at Trentwood) stating that she had "been trying
to get a hold of Mr. Yeager, particularly in the last few weeks, as he
has been on sick leave since February 4, 2009, and has not returned the
sick leave paperwork or procured a note from the doctor to certify the
[sick] leave."  That same day, April 3, 2009, Mr. Stoyell-Mulholland
forwarded the NCM's April 3, 2009 email to Gary Newbill (the Chief
Grievance Person for the Union). Mr. Stoyell-Mulholland advised Mr.
Newbill that Mr. Yeager "has not been complying with the process - he has
failed to return appropriate paperwork and phone calls.  At this time the
Company will suspend Mr. Yeager's [S&A] benefits if he does not provide
the appropriate paperwork to OHS by end of business on Monday, April 6,
2009.  Please call me with any questions."

Between April 3, 2009 and mid-April 2009, Mr. Newbill attempted,
on multiple occasions, to contact Mr. Yeager by telephone.  Despite these
efforts, he was unable to reach Mr. Yeager.  Nonetheless, on each
attempt, he left a message on Mr. Yeager's cell phone voicemail
requesting that Mr. Yeager contact him either at the Union Hall or on his
cell phone.  Mr. Yeager did not return Mr. Newbill's calls.  On **April 6,
2009,** after conferring with Plaintiff's union representatives regarding
Plaintiff's failure to obtain a certification authorizing his absence
from work (as required by Kaiser's Absentee Policy), the Company
suspended Plaintiff's S&A Benefits.
///

ORDER - 9

On **April 17, 2009,** Mr. Newbill wrote a letter to Mr. Yeager advising him that he was not only concerned about Mr. Yeager's loss of S&A Benefits, but his potential termination from Kaiser for job abandonment pursuant to the Absentee Policy unless Mr. Yeager provided the "information as requested". ECF No. 22-2. Mr. Yeager admits receiving this letter. ECF 41-1 at 7. In this letter regarding "Suspension of Benefits," Mr. Newbill writes, in relevant part:

> I am writing you in regards to a communication that I received from the Company dated April 3, 2009 stating that your Company provided Sickness and Accident Benefits, were going to be suspended for a lack of compliance with the Nurse Case Manager, unless the Company received an appropriate response from you by the end of business on Monday, April 6, 2009. Since that time I have attempted to contact you by telephone and have left multiple messages on your voice-mail asking you to contact me here at the Hall or on my cell phone. To date, I have not received a response from you. As I have conveyed to you in the messages that I have left on your voice-mail, I am concerned not only with your benefits being suspended, but it is my belief that the Company's next step will be to terminate you for job abandonment as set forth under Paragraph V of the Trentwood Absentee Control Policy. I cannot stress to you enough, the importance of you contacting me immediately in order to resolve this issue. In order for the Union to be able to provide you representation, you need to return phone messages in a timely fashion and provide information as requested. Again, Mr. Yeager, the Union stands ready to represent you, to the point of helping you file a grievance on your behalf. But in order to do so, it will take both your effort and cooperation in providing the best representation possible.

ECF No. 22-2

On **April 24, 2009,** Plaintiff indicated that he spoke to NCM Rise on the phone and told her that he did not receive her numerous messages. ECF No. 33 at 10. On or about **April 23, 2009,** Mr. Newbill received a note that Mr. Yeager had telephoned him on **April 23, 2009.** It is

undisputed that after receiving the message, Mr. Newbill returned Mr. Yeager's call and left multiple messages on Mr. Yeager's voicemail requesting a return of Mr. Newbill's calls.  Mr. Yeager never returned any of Mr. Newbill's calls, and Mr. Newbill was not able to speak with Mr. Yeager.  ECF No. 22 at 3.

On **April 24, 2009**, Plaintiff again spoke to NCM Rise, which he asserts was the first time NCM Rise told him he needed to get an excuse from a health care provider for his absence from work.  *Id.*

Plaintiff has never provided the requested certification authorizing his absence during the relevant time frame at issue (February 5-April 23, 2009), although he knew[5] in February 2009, or at the latest, April 24, 2009 that he would need such documentation from a health care provider. During this relevant time period, as learned through the course of litigation, Mr. Yeager had two visits with Dr. Steven Silverstein.  The first visit occurred on **February 13, 2009**.  Dr. Silverstein concluded that all of Mr. Yeager's tests were essentially normal.  Mr. Yeager did not see Dr. Silverstein again until **April 24, 2009**.  Dr. Silverstein determined that all of Mr. Yeager's tests were normal.  Dr. Silverstein expressly noted that Mr. Yeager "does not need intervention." ECF 15-7 at 112, 113.

On **April 24, 2009**, Mr. Yeager went to the Deer Park Clinic in an apparent attempt to get the needed note from his health care provider to excuse his 2-month absence from work and to remain on sick leave.  Mr. Yeager saw Derek Hennessy (certified physician's assistant or PA-C) for

---

[5]NCM Rise noted in her Progress Notes that Plaintiff expressed concern about getting points as early as February 8, 2009.  Deposition of Jenniephier Rise, ECF No. 15-2 at 47.

ORDER - 11

the first time, but still failed to obtain a doctor's note excusing him for his absence from work, which by that time, extended from February 5, 2009 to April 24, 2009.

On **May 14, 2009,** NCM Rise emailed Kyle England (Kaiser's Labor Relations Manager) and advised him that she had received some of the non-occupational [S&A] paperwork back from Mr. Yeager's doctor, but that the paper work indicated Mr. Yeager's initial treatment occurred on **April 24, 2009,** despite being absent from work since early February of 2009. She also advised Mr. England that "[h]e has also not gotten any of the medical records to me like I requested."  NCM Rise did not disclose anything about Mr. Yeager's medical condition to Mr. England or his fitness to return to work.

On **May 18, 2009,** PA-C Hennessy cleared Mr. Yeager to return to work at Kaiser without restrictions, but still had not excused Mr. Yeager from work for the period between February 5, 2009 through April 23, 2009.  On **May 18, 2009,** Mr. England sent a letter "Re: Sickness & Accident Benefit Termination" to Mr. Yeager (which Yeager received) and copied the same to the Union.  In part, the letter reads:

> I am writing you today regarding your Sickness & Accident Benefit termination as well as your employment with Kaiser Aluminum.  Based upon you failure to provide information/documentation necessary to cover your absences from work, the Company is faced with separating you from the payroll resulting in your termination from (sic) Kaiser.  You have until 4 p.m. on Friday, May 22nd, 2009 to provide medical records regarding your inability to work.  Failure to provide the requested information/documentation prior to the deadline shall result in your termination.  Please contact me at 509-927-6609 if you have any questions or concerns regarding this notification.

ECF No. 16-4.

ORDER - 12

On **May 18, 2009,** Mr. England also sent a letter to Mr. Rolf Laurin at the Union.  Mr. Laurin is the Health and Safety Chairman for the Union.  This letter advised Mr. Laurin of the circumstances leading to the suspension of Mr. Yeager's S&A benefits.  Mr. England's letter also notified the Union that "[t]he Company has made several attempts to contact [Mr. Yeager] . . . regarding [his] failure to provide . . . associated Doctor's notes covering [his] absences from work." The letter also advised that Mr. Yeager had until May 22, 2009, at the close of business to provide the required documentation or he would be terminated. The Union's President and the Union's Chief Grievance Person were copied on the letter.  On that same day, Mr. England sent an email to Mr. Laurin, advising him to speak with Mr. Newbill who had been trying to work with Mr. Yeager.  Mr. Laurin responded that he would do so.

On **May 21, 2009,** Plaintiff indicates he received Mr. England's letter dated May 18, 2009.  ECF No. 33 at 14.  Plaintiff states he went to Deer Park Family Care Clinic and signed the clinic's medical release authorizing the clinic to release his records to Kaiser.  *Id*.  On that same day, Plaintiff states he also spoke to NCM Rise and told her she could now get the records and the clinic was going to send them to her upon her request.  *Id*.  Plaintiff states it was his belief that Kaiser had to request the medical records directly from the doctor's office. *Id*.

On **May 22, 2009,** the decision was made not to terminate Mr. Yeager as Mr. England was having ongoing discussions with the Union whether Mr. Yeager had provided the information that would excuse his absence from work.  On **June 1, 2009,** Mr. England sent an email to NCM Rise and her

boss, NCM Moyer, asking whether OHS had heard from Mr. Yeager.  NCM Rise responded that she had not received the medical information concerning his unexcused absences that she had requested from Mr. Yeager on numerous occasions.  ECF 24 at 20.  On that same day, Mr. England additionally sent an email to NCM Rise stating, in part, that:

> . . . [the Union] is under the impression that Luke [Yeager] had provided the requested information.  Could you let me know what he did not provide before I terminate.

NCM Rise responded, telling Mr. England that she had not received the information.  Mr. England responded to NCM Rise's email by asking, "What was he supposed to provide."  NCM Rise replied that, "Medical documentation to support his then unexcused leave from 2/5/09 through April."  ECF 24 at 20.

On **June 27, 2009**, Mr. England asked NCM Rise to provide the Union's new Chief Grievance Person, Dave Carlson, a list of the documents requested from, but never provided by, Mr. Yeager.[6]  On **June 27, 2009**, Mr. England sent a letter of employment termination to Mr. Yeager, with copies to the Union.  Mr. England explained that the reason for this termination was Mr. Yeager's failure to provide the required documentation relating to his absences from work.  Mr. England also invited Mr. Yeager to call him if he had any questions or concerns regarding his termination.  Mr. Yeager did not respond to this letter which he received.

///

---

[6]In May 2009, Mr. Carlson had been elected as the new Union Chief Grievance Person, taking Mr. Newbill's place in this Union position.

1    On **June 29, 2009,** NCM Rise responded to Mr. England's email of June

2   27, 2009 by sending an email to Mr. Carlson advising him that:

3          Mr. Yeager was placed on non occ [sic] leave on
           2/5/2009. I called him numerous times asking for medical
4          certification to substantiate his leave.  When he
           supplied [a] doctor's certification to be off work
5          (received 5/13/09) the doctor only covered him to be off
           starting 4/24/09.  We have not been given any
6          documentation to support his non occ [sic] leave between
           2/05/09 and 4/24/09.

7

8   ECF 24 at 21.

9    On **June 30, 2009,** the Union filed a Grievance contesting the

10   termination of Mr. Yeager.  This filing commenced the multi-step

11   Grievance process.  In July 2009, the Company and Union held a Step 3

12   Meeting concerning Mr. Yeager's termination.  The Step 3 Meeting was the

13   first step in the Grievance process.  After the meeting, the Company

14   prepared an answer documenting the parties' positions as set forth in the

15   Step 3 Meeting.  The Company reiterated its position that Mr. Yeager had

16   been properly terminated for failing to provide the Company with

17   documentation excusing his long-term absence from work.  Further, the

18   Company explained that Mr. Yeager had been given ample opportunity to

19   provide the information, but still had failed to do so.

20   On **July 28, 2009,** the Union withdrew the Grievance contesting Mr.

21   Yeager's termination for two reasons.  First, Mr. Yeager had failed to

22   provide the Union with any documentation excusing his absences between

23   February 5, 2009 and April 24, 2009.  Second, the Union's several

24   attempts to discuss with Mr. Yeager the facts surrounding his termination

25   were unsuccessful which made it difficult, if not impossible, for the

26   Union to represent him and contest his discharge.

ORDER - 15

Finally, on **August 27, 2009**, after he had been terminated, Plaintiff obtained a note from PA-C Hennessy attempting to retroactively excuse him from work for the period between February 5 and April 24, 2009[7], some two months after Plaintiff had been terminated from employment. PA-C Hennessy describes his note as "well-after-the-fact" and "atypical" of his customary practice.

**E. Discussion**

Defendant Kaiser argues that the termination of Plaintiff was lawful based on Plaintiff's failure to comply with the Absentee Policy.

Plaintiff asserts that his termination occurred because he was perceived to be disabled. Plaintiff argues that even if failure to follow a sick leave policy is one of the reasons for Plaintiff's discharge, pretext can still be shown by presenting evidence that his disability was a motivating factor as well. Plaintiff alternatively argues that Defendant Kaiser in essence promised Mr. Yeager that he would be returned to work if he produced a valid work release. However, this argument is supported neither by the facts or the law. Plaintiff argues he acted in reliance on that alleged promise. Finally, Plaintiff suggests, under a Cat's Paw theory, that NCM Rise had a bias against Plaintiff because of his impairment and she somehow influenced Mr. England's decision to terminate him.

Although Plaintiff claims he was not aware he needed to provide an excuse from a health care provider for his absence until **April 24, 2009**, and that he was under the impression that the burden was on Kaiser or NCM

---

[7]As stated earlier, Mr. Yeager did not see PA-C Hennessy until April 24, 2009, but failed to even obtain a doctor's note excusing him for his absence from work until August 27, 2009.

ORDER - 16

Rise to procure his medical records, there is no dispute that Plaintiff received the letter dated **April 17, 2009** from Mr. Newbill which clearly stressed the urgent need for his communication and cooperation in providing the requested information to excuse his 2-month absence. There is also no dispute that on **May 21, 2009**, Plaintiff received Mr. England's letter dated May 18, 2009, which again addressed his failure to provide information/documentation necessary to cover his absences from work and gave him a final deadline of **May 22, 2009** to provide medical documentation. That date was in effect extended into late June 2009 while Kaiser and the Union reviewed matters as noted above (p. 14, lines 1-3).

Simply put, at no time prior to Plaintiff's termination, did Mr. Yeager provide documentation excusing his absence from work between February 4, 2009 and April 23, 2009.

As to Plaintiff's theory of discrimination, at no time from February 4, 2009 through April 23, 2009, did Defendant know anything about Plaintiff's condition or medical treatment. Moreover, Plaintiff never claimed or suggested disability for the time period of his absence until two (2) months after his termination despite not having obtained a medical excuse for his earlier time off the job. Neither did Plaintiff ask or suggest any type of accommodation during that period. The only treating physician Plaintiff saw during this absence from work was Dr. Silverstein, who did not submit a note or opinion suggesting Plaintiff was unable to work during the time period in question. In fact, Dr. Silverstein found all tests to be normal and noted that medical intervention was not needed.

ORDER - 17

1    Finally, there is nothing in the CBA that requires Defendant Kaiser

2    to wait or delay a decision to terminate based upon the possibility of

3    receiving a future medical excuse many weeks (in this case, months) after

4    the same was due.  Similarly, there is nothing in the Absentee Policy or

5    CBA that requires or shifts the burden to Occupational Health Solutions

6    (or NCMs) or Kaiser to obtain Plaintiff's medical records or medical

7    documentation for his absence.

8    There are no genuine issues of material fact precluding the court

9    from finding as a matter of law that Defendant Kaiser's termination of

10   Mr. Yeager was lawful and not discriminatory.  Pursuant to the Absentee

11   Policy, Defendant Kaiser had the legal right to terminate any employee

12   who failed to adhere to its terms and enforcing this neutrally-based

13   policy did not establish an inference of discrimination.

14   **IT IS ORDERED** that:

15   1. Defendant Kaiser's Motion For Summary Judgment, **ECF No.  14**,

16   filed on November 6, 2013, is **GRANTED.**  Defendant is awarded judgment on

17   all claims asserted against it by Plaintiff.

18   2. Plaintiff's Motion To Strike, **ECF No. 35**, is **DENIED.**

19   3. Defendant's Motion to Exclude Hennessy, PA-C, **ECF No. 45**, is

20   **DENIED as MOOT.**

21   4. Plaintiff's Second Motion to Strike Affidavit, **ECF No. 47**, is

22   **DENIED.**

23   ///

24   ///

25   ///

26   ///

ORDER - 18

1      5. Plaintiff's Motion to Exclude Expert Witness Tod Fleming, PA-C,

2  **ECF No. 50,** is **DENIED as MOOT.**

3      **IT IS SO ORDERED.**

4      The District Court Executive is directed to enter this Order, enter

5  judgment consistent with this order, and **CLOSE THE FILE.**

6      **DATED** this 26th day of March, 2014.

7

8                                   *s/Lonny R. Suko*

9                            _____
                                      LONNY R. SUKO
10                            SENIOR UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER – 19